IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| H.F.S.R., | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:26-cv-238-AT |
| LADEON FRANCIS, *in his official* | : | |
| *capacity*; TODD LYONS, *in his official* | : | |
| *capacity*; KRISTI NOEM, *in her* | : | |
| *official capacity*; *and* PAMELA | : | |
| BONDI, *in her official capacity*, | : | |
| | : | |
| Respondents. | : | |

## **ORDER**

This country, built with the aid of immigrants' hard work and ingenuity, now faces abrupt changes in immigration enforcement practices and policies. Petitioner H.F.S.R., a recipient of Temporary Protected Status ("TPS") and current asylum seeker, has filed a Verified Petition for a Writ of Habeas Corpus [Doc. 7]. Petitioner seeks to enjoin his likely imminent detention at an immigration hearing tomorrow, which the Department of Homeland Security ("DHS") scheduled on January 7, 2026, explicitly to address Petitioner's removal from the United States based on his having been recently classified by DHS as an "arriving alien" subject to deportation. (Doc. 13.) For the reasons discussed at length below, the Court **GRANT**S Petitioner's Writ of Habeas Corpus [Doc. 7] and **DECLARES** that Petitioner is not an "arriving alien" as contemplated by 8 U.S.C. § 1225.

## I.    BACKGROUND

Petitioner H.F.S.R., who proceeds here under a pseudonym,[1] originally came to the United States from Honduras. (Doc. 14). He first entered the United States without inspection in 1998 and, shortly after, he applied for and obtained TPS, a form of legal temporary residence for non-citizens. (Doc. 14). Thus, Petitioner "[has] resided in the U.S. for over a decade with valid TPS" — and, in fact, much longer. (Am. Compl., Doc. 7 ¶¶ 23, 118). His last entry into the United States was in 2016, long after his home country Honduras was designated for TPS. (Doc. 14). Petitioner resides in Duluth, Georgia, where he "leads a stable, work-centered daily life," "maintain[ing] steady employment and support[ing] his child." (Am. Compl., Doc. 7 ¶ 30). "He remains in contact with his family in his home country, including his mother, following the violent killing of his father in 2022." (*Id.*). He has no criminal record. (Doc. 14).

On October 16, 2025, Petitioner was notified that removal proceedings had been initiated against him. (Doc. 13). That Notice to Appear explicitly classified him as an "arriving alien" and scheduled a hearing date of June 16, 2027. (*Id.*). Then, on January 7, 2026, Petitioner received a subsequent Notice of In-Person Hearing that moved his hearing up to tomorrow, January 21, at the Atlanta Immigration Court. (Am. Compl., Doc. 7 ¶ 33; *see also* Doc. 1-6 (Notice of In-

---

[1] "Petitioner is an asylum applicant whose claim involves highly sensitive facts and a real risk of retaliation if his identity is publicly disclosed." (Doc. 11 at 1). The Government indicated during a hearing held on January 20, 2026, that it does not oppose Petitioner's Motion to Proceed Under a Pseudonym in this proceeding. (Doc. 14). Accordingly, the Court has granted that Motion. (Doc. 12).

Person Hearing)). The Notice of In-Person Hearing warns that failure to appear for "removable" non-citizens will lead to an order of removal. (Doc. 1-6). On January 15, 2026, Petitioner filed the instant Habeas Petition [Doc. 7] and Motion for a Temporary Restraining Order [Doc. 2]. The Government was served the same day. (Doc. 8). The Court held a hearing on Tuesday, January 20, and heard argument from both parties. (Doc. 14).

## II.    JURISDICTION

The Court first addresses its jurisdiction in the instant habeas proceeding. Federal law limits the jurisdiction of federal courts in certain immigration contexts.  The provision outlining judicial review of removal orders states:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General **to commence proceedings, adjudicate cases, or execute removal orders** against any alien under this chapter.

8 U.S.C. § 1252(g) (emphasis added). But the Supreme Court has explicitly disclaimed the notion that Section 1252(g) is a "zipper clause" that "covers the [entire] universe of deportation claims." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (describing "many other decisions or actions that may be part of the deportation process," which would fall within the court's jurisdiction, "such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various

3

provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order"). Petitioner's requested relief would prevent his unlawful detention. His habeas petition does not ask or require the Court to decide on any action to "to commence proceedings, adjudicate cases, or execute removal orders." This Court thus retains its jurisdiction.

The Court's habeas jurisdiction is subject to additional scrutiny, however, given that Petitioner has not yet been physically detained. As a general rule, "[a] district court may entertain a habeas corpus petition only if a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Whitfield v. U.S. Sec'y of State*, 853 F. App'x 327, 329 (11th Cir. 2021) (quoting 28 U.S.C. §§ 2241(c)(3), 2254(a)). But "the 'in custody' requirement should be construed 'very liberally.'" *Clements v. Florida*, 59 F.4th 1204, 1213 (11th Cir. 2023). This is because the "custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty." *Hensley v. Mun. Ct., San Jose Milpitas Jud. Dist.*, 411 U.S. 345, 351–2 (1973) (holding petitioner released on recognizance is "in custody" for purposes of habeas petition because "[h]is incarceration [was] not [merely] a speculative possibility" and the government "retain[ed] the determination and the power to seize him"). The Eleventh Circuit has specifically held that "non-citizens released on supervision while awaiting a final decision in their immigration proceedings are deemed to be 'in custody' for purposes of habeas corpus."

4

*Clements*, 59 F.4th at 1214 (citing *United States ex rel. Marcello v. Dist. Dir. of INS, New Orleans*, 634 F.2d 964, 971 & n.11 (5th Cir. 1981)).

As in *Hensley*, Petitioner has not been physically detained — yet. But, also as in *Hensley*, Petitioner experiences a significant, imminent, and non-speculative threat to his personal liberty, given the circumstances created by his pending removal proceeding and required appearance at the immigration court.

Over the last several months, U.S. Immigration and Customs Enforcement ("ICE") has frequently detained non-citizens at immigration courthouses when they arrive to comply with their duty to appear in court, as recognized by both federal courts and media reports.[2] (*See* Am. Compl., Doc. 7 ¶¶ 34–39); *see also, e.g.*, *Make the Rd. New York v. Noem*, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)[3]; *Pablo Sequen v. Albarran*, 2025 WL 3724878 (N.D. Cal. Dec. 24, 2025) (certifying class of "all noncitizens with upcoming immigration hearings . . . at an

---

[2] Joshua Goodman & Gisela Salomon, *ICE Agents Wait in Hallways of Immigration Court as Trump Seeks to Deliver on Mass Arrest Pledge*, ASSOCIATED PRESS (May 22, 2025), https://apnews.com/article/immigration-courts-arrests-trump-ice-deportations-fa96435d4ec021cc8ff636b23d80d848; Joshua Goodman & Tim Sullivan, *They Thought They Were in Court For a Routine Immigration Hearing, But Walked Into a Deportation Trap*, PBS NEWS (Nov. 19, 2025), https://www.pbs.org/newshour/nation/they-thought-they-were-in-court-for-a-routine-immigration-hearing-but-walked-into-a-deportation-trap.

[3] "[B]eginning in May 2025, enforcement efforts significantly ramped up. The agency set a goal of 3,000 immigration arrests each day, including many individuals already in regular removal proceedings—often those pursuing asylum or other relief. To achieve that end, the Department has repeatedly carried out arrests at immigration hearings. The pattern is consistent: The Department first moves orally—and without advance notice—to terminate the individual's pending [removal] proceedings. The moment those proceedings are dismissed, agents seize the individual at the courthouse. They then place the person into Expedited Removal." *Make the Rd. New York v. Noem*, 2025 WL 3563313 at *7 (D.C. Cir. Nov. 22, 2025) (cleaned up).

immigration courthouse in ICE's San Francisco Area of Responsibility" and staying ICE's policy of making courthouse arrests based on likely finding that it is arbitrary and capricious); *Munoz Materano v. Arteta*, 2025 WL 2630826 (S.D.N.Y. Sept. 12, 2025) (non-citizen was arrested by ICE as he left his asylum hearing at immigration court); *Otilio B.F. v. Andrews*, 2025 WL 3152480 (E.D. Cal. Nov. 11, 2025) ("Prior to the [petitioner's immigration] hearing, immigration agents arrested [him] as he was exiting an elevator at the state courthouse. . . . Immigration authorities did not allow petitioner to attend his state court hearing. . . . [H]e remains detained."); *Hernandez Nieves v. Kaiser*, 2025 WL 2533110 (N.D. Cal. Sept. 3, 2025) ("[A]fter attending her ICE check-ins and immigration-court hearings without incident, immigration agents arrested [petitioner] . . . following a routine court appearance."); *Li v. Cantu,* 2025 WL 2420323 (D. Ariz. Aug. 21, 2025) ("Petitioner appeared in immigration court for a scheduled master calendar hearing. . . . Upon conclusion of the hearing, Petitioner was arrested by four ICE agents."). Most significantly, these arrests have included long-term non-citizen residents, those with no criminal records, and those seeking asylum. This is exactly the position of Petitioner in the instant case.

Petitioner, who has lived in the country legally for over a decade as a valid TPS holder, has been directed to appear at the Atlanta Immigration Court on January 21, 2026, in connection with an ongoing removal proceeding against him. (*See* Doc. 1-6 (Notice of In-Person Hearing)); *Clements*, 59 F.4th at 1214 ("To use just [one] of the registration and reporting obligations in *Marcello* and *Romero* as

6

markers, Mr. Clements—like the petitioners in those two cases—has to report in person to the authorities periodically[.]" (citing *Marcello*, 634 F.2d at 964; *Romero v. Sec'y, U.S. Dep't of Homeland Sec.*, 20 F.4th 1374 (11th Cir. 2021))). If Petitioner does not appear in court, immigration officials are likely to issue a Notice of Removal. (*See* Doc. 1-6 (Notice of In-Person Hearing); *see also* Am. Compl., Doc. 7 ¶ 33). The combination of Petitioner's non-citizen status, his pending removal proceeding, and the reports of ICE's recent detentions of non-citizens at routine court hearings creates a concrete threat to Petitioner's liberty. Most importantly, the most recent January 7, 2026 Notice to Appear for a "CONTESTED MASTER [H]earing" (Doc. 1-6) is clearly intended to place Petitioner, after years of compliance with all immigration rules, in the highly likely posture of being immediately detained and deported.

Respondents contend that Petitioner's alleged detention is insufficiently imminent and thus does not render him as "in custody" for the purposes of habeas jurisdiction. Respondents noted at this morning's hearing that while immigration enforcement officials do not specifically "pre-plan" to arrest Petitioner, they could make no "promises." (Doc. 14). But, as Petitioner points out, it is now the *policy* of ICE to mandatorily detain "arriving aliens." (Amd. Compl., Doc. 7 ¶ 3). A July 8, 2025 directive to ICE employees indicated that the agency now considers any non-citizen "who has not been admitted" to be an "applicant for admission." (Doc. 1-3 (ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission)). The memo indicates that "[e]ffective immediately, it is the position

of DHS that such aliens are subject to detention"; "may not be released from ICE custody except by [parole]"; and "are also ineligible for a custody redetermination hearing ('bond hearing') before an immigration judge." (*Id.*). Petitioner's original Notice to Appear explicitly classifies him as an "arriving alien." (Doc. 13). Petitioner's potential detention upon arriving at his hearing tomorrow is, thus, not speculative; rather, it is a foreseeable result of ICE's new detention policy.

Respondents further point to a recent case from this district, *Momin v. Sterling et al.*, No. 1:25-cv-6437-MHC, Doc. 6 (N.D. Ga. Nov. 11, 2025), where a non-citizen petitioner scheduled to report for an appearance with ICE sought an order enjoining her arrest or detention on the basis that her medical issues would be exacerbated by detention. There, the court held that petitioner had failed to present a live case or controversy because "she [had] not alleged facts to show that she has suffered an injury that is concrete, particularized, and actual or imminent, nor has she established that Respond[ents] have caused her any harm." *Id.* at *6. Specifically, the court there held that "[t]he Complaint does not allege that Petitioner faces actual or imminent arrest or detention when she appears [before ICE] but merely that it is a possibility. *Id.* at *7 (citing *31 Foster Child. v. Bush*, 329 F.3d 1255, 1265–66 (11th Cir. 2003) ("[F]uture injury that depends on either the random or unauthorized acts of a third party is too speculative to satisfy standing requirements.")).

But the court's decision in *Momin* is distinguishable from the instant case. In the first instance, the petitioner's barebones pleading in *Momin* makes no

allegations as to why petitioner's arrest was or would have been imminent in that situation. *Momin v. Sterling et al.*, No. 1:25-cv-6437-MHC, Docs. 1, 2 (N.D. Ga. Nov. 11, 2025). Conversely, Petitioner in the instant matter specifically alleges that his "potential confinement at the Northern District of Georgia is imminent solely because of ICE's invocation of its new interpretation that Petitioner is an 'arriving alien' or 'applicant for admission' and is therefore subject to mandatory detention." (Amd. Compl., Doc. 7 ¶ 44). In this way, ICE's potential detention of Petitioner is not "random." As Petitioner has alleged, his detention has been not only authorized but in fact required by the agency.

At least one other decision in this district has affirmed the court's habeas jurisdiction over a non-citizen who had concrete reason to fear imminent detention. In *Nguyen v. Lyons et al.*, No. 1:25-cv-5896-VMC-RDC, Doc. 13 at *4 (N.D. Ga. Oct. 24, 2025), a man subject to a 20-year-old Notice of Removal and ICE Order of Supervision feared imminent detention at an upcoming appointment because of "recent changes to ICE practices," including "terminat[ing] remote reporting and require[ing] in-person reporting appointments"[4] and the detention of "similarly situated individuals" who had no immigration violations. There, the court found that petitioner was rendered "in custody" sufficient to establish habeas jurisdiction because "Petitioner [was] also restricted in his movement and cannot come and go as he pleases" and because "ICE also has the power and authority to

---

[4] Petitioner's counsel also indicated at today's hearing that her client's appearances have switched from remote to in-person only, with no provided explanation as to why that change occurred. (Doc. 14).

seize him and has indicated a concrete, imminent, and non-speculative threat of re-detention as evidenced by its actions against similarly situated individuals." *Id*. at \*8.

Petitioner in the instant case faces comparable circumstances. As in *Nguyen* and *Hensley*, Petitioner has a non-speculative reason to fear he will be detained by ICE upon attending his required court appearance. This concrete fear is supported by (1) ICE's systemic policy change requiring the mandatory detention of any non-citizens it classifies as "arriving aliens" and (2) the increased detention of non-citizens with no previous immigration violations who are present in courthouses or immigration buildings for their routine immigration check-ins. The Court thus finds that Petitioner has been sufficiently rendered "in custody" to support its habeas jurisdiction. *See supra* at 4–5.

## III.  DISCUSSION

### A. Petitioner's TPS Status

The Court briefly turns to Petitioner's current immigration status as a long-standing TPS holder. The TPS program allows the federal government to grant temporary protected status to a national of a foreign state in designated cases of ongoing armed conflict, environmental disaster, or other extraordinary and temporary conditions that prevent safe return. 8 U.S.C. § 1254a(b)(1). Congress enacted the TPS statute "out of concern that the forced repatriation of these individuals could endanger their lives or safety." H.R. Rep. 100-627, at 6 (1988). Pursuant to 8 U.S.C. § 1254a(a)(1)(B), the Attorney General may designate a

country for TPS and grant nationals of that country protection from removal, as well as work authorization in the United States for the period their home country is designated under the program. The statute also indicates that, periodically, the Secretary "shall review the conditions in the foreign state . . . for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3). In the event the Attorney General finds that the country no longer merits TPS designation, she "shall terminate the designation by publishing notice in the Federal Register of the determination." *Id.*

On July 8, 2025, Secretary of Homeland Security Kristi Noem published a notice in the Federal Register terminating TPS status for Honduras, Petitioner's home country. (Am. Compl., Doc. 7 ¶ 31). The termination became effective on September 8, 2025 – sixty days after publication of the notice, the shortest allowable transition period allowed by the statute.

Subsequently, a California federal court held that the Secretary's decision was unlawful. *Nat'l TPS Alliance, et al., v. Noem, et al.*, No. 3:25-cv-5687-TLT, 2025 WL 4058572 (N.D. Cal. Dec. 31, 2025), *appeal docketed* No. 26-199 (9th Cir. 2026). The class-action lawsuit challenged the decision under the Administrative Procedure Act ("APA") and the Due Process Clause of the Constitution. The court certified three classes of individuals: all persons who have been granted TPS pursuant to the TPS designation of (1) Honduras; (2) Nepal; and (3) Nicaragua. *Id.* at *10. Petitioner is a member of the Honduras class. (Am. Compl., Doc. 7 ¶ 31).

The court held, *inter alia*, that the DHS Secretary's decision to terminate the TPS designations of Honduras, Nicaragua, and Nepal was arbitrary and capricious because the decision was "preordained." *Nat'l TPS Alliance,* 2025 WL 4058572, at *23. Specifically, the court found that the DHS Secretary's decision was not based on an objective review of the countries' conditions after consultation with the appropriate interagency department, as required by the TPS statute and the APA. *Id.* at *23–29. Ultimately, the court vacated the Secretary's termination decision with respect to Honduras, Nicaragua, and Nepal, effectively reinstating the TPS status of non-citizens from those countries, including Petitioner. (Amd. Comp., Doc. 7 ¶ 31).

To provide an orderly transition period, a decision to terminate a country's TPS "shall not be effective earlier than 60 days after the notice is published or, if later, the expiration of the most recent previous extension." 8 U.S.C. § 1254a(b)(1)(C). When terminating TPS for Honduras, Nicaragua, and Nepal, the DHS Secretary imposed a transition period of exactly sixty days, i.e., the statutory minimum. The California federal court, however, found that decision to be an unlawful and unexplained deviation from historical practice. *Nat'l TPS Alliance,* 2025 WL 4058572, at *27. Historically, the court noted, DHS decisions to terminate TPS designations were followed by "at least a six-month orderly transition period," often extending to an eighteen-month period. *Id.* Because the Secretary's notice of TPS status for Petitioner's home country failed to acknowledge or explain the departure from its decades-long practice of providing

at least six months for orderly transition, the court found that decision also violated

the APA. *Id.* at *28.

In sum, the California federal district court held that the DHS Secretary

acted unlawfully in terminating the TPS designations of Honduras, Nicaragua, and

Nepal and vacated that Executive Order.[5] As the California court found, "[w]hen a

federal court concludes that an agency adjudicative order [or any other agency

action] is unlawful, the court must vacate that order." *Id.* at *29 (quoting *Corner

Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 830–31 (2024)

(Kavanaugh, J., concurring)).

Because the California federal court vacated the executive action in its

entirety, its decision is applicable to *all* TPS holders from Honduras, Nicaragua,

and Nepal, including Petitioner. *See Nat'l TPS Alliance et al. v. Noem*, 150 F.4th

1000, 1028 (9th Cir. 2025) (where DHS terminated extension of TPS and federal

---

[5] Other federal district courts have found similar procedural deficiencies in the DHS
Secretary's other TPS termination decisions. *See, e.g.*, *CASA, Inc. v. Noem*, 792 F. Supp.
3d 576, 607 (D. Md. 2025), *aff'd* 2025 WL 2028397 (4th Cir. July 21, 2025) (at summary
judgment, finding plausibly alleged APA violation on grounds that TPS termination of
Afghanistan and Cameroon could have been "preordained terminations of TPS
designations in order to reduce the number of non-white immigrants and thus were
arbitrary and capricious"); *Nat'l TPS Alliance v. Noem*, 798 F. Supp. 3d 1108, 1116 (N.D.
Cal. 2025) ("The Secretary's action in revoking TPS [for Venezuela and Haiti] was not
only unprecedented in the manner and speed in which it was taken but also violat[es] the
law. For the reasons explained below, the Court find that the Secretary's actions in
vacating the orders of the prior administration and terminating TPS exceeded the
Secretary's statutory authority and was arbitrary and capricious, and thus must be set
aside under the [APA]."), *stayed pending appeal Nat'l TPS Alliance*, 2025 WL 2812732
(mem) (Oct. 3, 2025); *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255,
273 (E.D.N.Y. 2025) ("Because Secretary Noem does not have statutory or inherent
authority to partially vacate a [Haiti's] TPS designation, her partial vacatur must be set
aside as unlawful under the APA.").

court postponed effective date, relief applied to all Venezuelan TPS holders because "limiting the relief to individual plaintiffs and NTPSA members is not a workable solution under the TPS statute" and to avoid "judicially created patchwork"); *Afr. Communities Together v. Noem*, No. 25-CV-13939-PBS, 2025 WL 3759533, at *2 (D. Mass. Dec. 30, 2025) (staying TPS termination decision and holding that "the legal consequences of being in TPS status based on South Sudan's designation shall continue to apply, including being eligible for work authorization and having protection against deportation and detention based on TPS status").

Again, because Petitioner is a member of one of the certified classes in the California decision, the California federal court's decision reinstated Petitioner's TPS status — at the very least, for the pendency of that proceeding, unless and until it is reversed by a higher court. This Court agrees with the conclusion that Petitioner's TPS status is currently valid because of the APA and due process deficiencies in the DHS Secretary's newly announced termination identified by the California district court.

## B. Mandatory Detention vs. Bond Hearing

### i. Statutory Framework

If Petitioner is detained by immigration enforcement authorities, prevailing case law from federal district courts nationwide dictates that he must be given an individualized bond hearing to evaluate the need for his detention based on any danger to the community and Petitioner's flight risk. "U.S. immigration law authorizes the Government to detain certain [non-citizens] seeking admission into

the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain [non-citizens] already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Jennings v. Rodriguez*, 583 U.S. 281, 290 (2018). The former, Section 1225, requires mandatory detention; the latter, Section 1226, calls for a bond hearing to determine whether detention is appropriate.

Under 8 U.S.C. § 1225, "in the case of [a non-citizen] who is an applicant for admission, if the examining immigration officer determines that [a non-citizen] seeking admission is not clearly and beyond a doubt entitled to be admitted, [he] shall be detained for a proceeding." In other words, Section 1225 "focuses on the admission of aliens upon their arrival to the United States or upon an attempt to obtain admission after arrival." *J.A.M. v. Streeval*, No. 4:25-CV-342 (CDL), 2025 WL 3050094, at *3 (M.D. Ga. Nov. 1, 2025). Conversely, non-citizens apprehended while already in the country are subject to the terms of Section 1226. Upon detention, then, they are entitled to a bond hearing and potential release. 8 U.S.C. § 1226(a). In the event Petitioner were detained now, after years of lawful residence in this country, he would fall into the second category, governed by Section 1226.

In recent months, the federal government — specifically, the Board of Immigration Appeals — has taken the position that all non-citizens not lawfully in the United States shall be apprehended under Section 1225, subjecting them to mandatory detention. *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025)

(holding federal law "require[s] that all applicants for admission, even those [] who have entered without admission or inspection and have been residing in the United States for years without lawful status, be subject to mandatory detention for the duration of their immigration proceeding").[6]

The Respondents' position that a non-citizen who has resided *lawfully* in this country for years now can instantly be subject to detention and expulsion under ICE's new regulatory regime is highly concerning and questionable. And as other courts have ruled, the Respondents' position that long-time residents may be, without proper notice and procedures, subject to detention is also contrary to a common-sense reading of the law. *See, e.g., Jimenez v. Warden, FCI Atlanta*, No. 25-cv-5650-SDG, Doc. 24 at 14 (N.D. Ga. Nov. 6, 2025) (citing cases).

Section 1225 outlines that non-citizens who are apprehended while "seeking admission" — i.e., apprehended while crossing the border or at a port of entry — "shall be detained for a proceeding." 8 U.S.C. § 1225(b)(2)(A). To reiterate the plain text of the statute: the law requires that a non-citizen *shall* be mandatorily detained only if they are actively *seeking admission. See also M.C.H.L. v. Roberson, et al.*, No. 4:25-cv-329, Doc. 23 at *12 (N.D. Ga. Dec. 16, 2025) (Ray, J.) (holding the Government's "interpretation overlooks the plain language of the phrase 'seeking admission' found within § 1225(b)(2)(A)"). To be clear, that is not Petitioner's

---

[6] Even under this erroneous interpretation, Petitioner could not be mandatorily detained. He has not "resid[ed] in the United States [] without lawful status," but rather has resided in the country lawfully under his TPS designation.

16

situation – he entered the United States decades ago and has been in compliance with the law ever since.

Dozens of federal courts across the country, including several of this Court's colleagues, have rejected the notion that all non-citizens residing in the United States are subject to mandatory detention. *See Jimenez v. Warden, FCI Atlanta et al.,* No. 1:25-cv-5650-SDG, Doc. 24 (N.D. Ga. Nov. 6, 2025) (Grimberg, J.); *Gonzalez v. Sterling et al.*, 2025 WL 3145764 (N.D. Ga. Nov. 3, 2025) (Cohen, J.); *Lima v. Warden et al.*, No. 1:25-cv-6304-ELR, Doc. 11 (N.D. Ga. Nov. 18, 2025) (Ross, J.); *M.C.H.L. v. Roberson, et al.*, No. 4:25-cv-329, Doc. 23 (N.D. Ga. Dec. 16, 2025) (Ray, J.); *see also* Doc. 1-2 (listing hundreds of federal district court cases with same outcome); *Bautista v. Santacruz*, 2025 WL 3713987 (C.D. Cal. Dec. 18, 2025) (vacating ICE policy that defaulted to applying Section 1225 for class of those apprehended within the United States). Specifically, courts have repeatedly emphasized that the Respondents' argument is without merit because it disregards the plain meaning of the statute, disregards the relationship between Sections 1225 and 1226, and is generally inconsistent with decades of prior statutory interpretation and practice. *Sterling,* 2025 WL 3145764, at *1. This Court agrees.

### ii. Application to Petitioner

Put simply: Petitioner is not an "arriving alien" seeking admission. He has resided in the United States for years, maintaining stable, lawful TPS designation until DHS's abrupt – and legally questionable – termination uprooted his life and legal status. "Applying [the] plain meaning, [Petitioner] 'cannot be said to have

been actively seeking lawful entry into the U.S. as it is undisputed that []he entered this country' several years before his present detention." *Lima*, No. 1:25-cv-6304-ELR, Doc. 11, at *8 (quoting *Gonzalez*, 2025 WL 3145764 at *6).

In the event, then, that Petitioner is detained by immigration authorities, he is entitled to an individualized bond hearing under Section 1226(a). Given that Petitioner has lived and worked in this country for more than a decade, maintains parental responsibilities for his young son, and has no criminal record, there is no evidence in front of this Court that Petitioner would present either any danger to the community or a risk of flight.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Petitioner's Writ of Habeas Corpus [Doc. 7] and **DENIES AS MOOT** Petitioner's Motion for a Temporary Restraining Order [Doc. 2]. The Court **DECLARES** that Petitioner is not an "arriving alien" as contemplated by 8 U.S.C. 1225. The Court **ENJOINS** Petitioner's detention by immigration enforcement officials under 8 U.S.C. 1225, based on his current immigration status.

The Court **ORDERS** that, should Petitioner be detained, he must be granted an individualized bond hearing under 8 U.S.C. 1226, which must independently assess whether he poses either a danger to the community or a flight risk. If Petitioner does not receive an individualized bond hearing **within 48 hours** of his detention, Respondents are **ORDERED** to release him.

The parties are **DIRECTED** to submit a status report by **Thursday, January 22, 2026, at 10 A.M.** indicating whether Petitioner has been detained. In the event Petitioner has been detained, the Respondents shall identify (1) the basis of his detention and (2) the date, time, and outcome (if applicable) of his required bond hearing.

**IT IS SO ORDERED** this 20th day of January, 2026.

_____
**Honorable Amy Totenberg**
**United States District Judge**